THOMAS A. COLTHURST (CABN 99493)
Chief, Criminal Division

MATTHEW M. YELOVICH (NYBN 4897013)
Deputy Chief, Criminal Division

MARJA-LIISA OVERBECK (CABN 261707)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-6809
    FAX: (415) 436-7234
    mari.overbeck@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  v.<br><br>JUAN GONZALEZ (aka "Crazy Indian"),<br><br>    Defendant. | **CASE NO. 21-CR-311 YGR**<br><br>**UNITED STATES' SENTENCING MEMORANDUM**<br><br>Hon. Yvonne Gonzalez Rogers<br><br>Hearing Date:  November 16, 2023<br>Time:            8:00 a.m. |

U.S. SENTENCING MEMO. RE JUAN GONZALEZ
21-CR-311 YGR

## I. INTRODUCTION

The government submits this memorandum in advance of the sentencing of defendant Juan Gonzalez (aka "Crazy Indian"). Gonzalez pled guilty to one count of Conspiracy to Commit Hobbs Act Robbery in violation of Title 18, United States Code, Section 1951(a) based on his agreement to conspire to obtain money or property from a residence in Union City, California. The parties have entered into a plea agreement under Federal Rule of Criminal Procedure 11(c)(1)(B). *See* ECF No. 105 (Plea Agreement). The government respectfully requests that the Court impose a sentence of 24 months, which is commensurate with the sentences of Gonzalez's co-defendants who have pleaded guilty and been sentenced by this Court. *See* ECF No. 165 (Presentence Investigation Report ("PSR")) at ¶ 5.

## II. FACTUAL BACKGROUND

### A. Procedural History

On August 12, 2021, a federal grand jury returned a three-count indictment charging six defendants with (1) Hobbs Act Conspiracy (Count One); (2) Conspiracy to Commit Murder in Aid of Racketeering (Count Two); and (3) Conspiracy to Commit Assault with a Deadly Weapon/Assault Resulting in Serious Physical Injury in Aid of Racketeering (Count Three). ECF No. 1. The indictment alleges the defendants' membership in a racketeering enterprise known as "El Hoyo Palmas" (EHP), an associated-in-fact group consisting of Norteño street gang members and associates. On February 23, 2023, Gonzalez pled guilty to Count One as part of a global resolution of the charges set forth in the indictment. The government has agreed to dismiss Count Two (VICAR murder conspiracy) and Count Three (VICAR assault conspiracy) of the indictment as against Gonzalez at the time of sentencing. Plea Agreement ¶ 13.

### B. Offense Conduct & Other Relevant Conduct

#### 1. Background of El Hoyo Palmas

EHP is subservient to the Nuestra Familia (NF) prison gang and, specifically, the Santa Clara County Regiment of the NF, operating in San Jose, California and the surrounding Santa Clara County area. *See* PSR ¶¶ 7–16. EHP has been in existence in San Jose since the 1970s. PSR ¶ 13. EHP has its own logos, tags, hand gestures, and terminology to designate themselves in public settings, such as the letter "P" or the word "Palmas," the logo of the Pittsburgh Pirates professional baseball team, and

Hawaiian style shirts with palm trees.[1] PSR ¶ 15.

The NF and EHP have common purposes, which include: committing crimes of violence to promote and enhance the reputation of the enterprise and to keep rivals gang members in fear of it; enriching leaders, members, and associates through trafficking of controlled substances and firearms and through the commission of robberies; and providing financial support to gang members who are charged with crimes or incarcerated. PSR ¶ 14.

EHP, like other Norteño street gangs, has multiple "generations." EHP is comprised of six generations.[2] Each generation consists of several years' worth of members and has its own higher- and lower-ranking members. Typically, one gains status within EHP based on the commission of violent acts on behalf of the gang (or the willingness to do so) or by making money through narcotics or other criminal ventures. *See* PSR ¶¶ 12, 14, 16. The six generations of EHP loosely reflect seniority within the gang, with the first generation being the oldest and the sixth generation being the newest. Meetings are held regularly, at which members pay dues and receive information about gang-related activities. During the meetings, attendees were generally separated by their respective generation. Prospective members need to prove their worth to gain entrance into EHP. Gaining entrance is often referred to as "being blessed."

EHP members are required to follow rules as dictated by both EHP and the NF more broadly. For EHP members, these rules were centered around respect, contributing to the gang, and not cooperating with law enforcement. PSR ¶ 16. A violation of the rules can be meet with "DP" or "discipline," which often involves being assaulted by other members. Other times a member can be "removed," which can include being killed.

### 2.     Underlying FBI Investigation

The FBI utilized multiple wiretaps in the Operation Quiet Storm/Grim Dawn investigation (e.g.,

---

[1] Gonzalez has several gang-related tattoos, including "XIV" and "Norte" on his forehead; a "P" on the front of his neck; "PALMAS" and a palm tree on the back of his neck; a palm tree on his chin; and "Norteño" on his chest, among others.

[2] In approximately 2009-2010, the San Jose Police Department conducted a large takedown of the earlier generations of EHP, many of whom were/are incarcerated. Consequently, the generations that were the most active during the period relevant to this indictment were the fourth, fifth, and sixth generations.

the related cases) into the NF and EHP.  Regarding EHP, those wiretaps included interceptions captured on a telephone (TT9) utilized by Gonzalez:

| TELEPHONE USER | TARGET TELEPHONE |
|---|---|
| Juan Dominguez | TT6 |
| Jose Garcia | TT8, TT10 |
| Juan Gonzalez | TT9 |

Much of the evidence supporting the indictment in this case came from these intercepted communications, and through these intercepted communications, the FBI learned that Gonzalez was a leader of the EHP gang, and was involved in criminal activities including robbery, drug dealing (primarily cocaine and methamphetamine), firearms trafficking, and assaults.

### 3. Union City Robbery Conspiracy

In early September 2018, several members of EHP conspired to rob drug dealers at a residence in Union City.  From intercepted communications, the FBI learned of the conspiracy, which they were able to thwart prior to its commission.

The conspiracy began when Defendant Caleb Eller[3] notified Defendant Jose Garcia of two marks (referred to in the intercepted calls as "licks") in an intercepted call on September 4, 2018.  TT8, Session 3058.  In that call, Eller informed Garcia that in one location the residents "push powder" (slang for cocaine) and said that he believed that by robbing the location, they would be able to "come up" with at least a "brick" (slang for kilogram) as well as money for another brick.  Garcia asked, "What's the deal with them? We have to knock doors down? Is there an easy way in? Or wait for somebody?"  Eller told him that the residents were two brothers who had already been robbed once before, and so he did not expect them to put up a fight, but that Garcia would have to "boot the door down and get it from them."  TT8, Session 3058.  Garcia responded, "Ok, ok, I don't give a fuck how it goes down."  TT8, Session 3058.  Eller said he would give Garcia the address of the house, and later texted Garcia "Union City" and "Drives a black Mustang." TT8, Sessions 3089, 3091.  Garcia then contacted Defendant Kyle Leonis via text message, writing: "I have a job for us" and "I'm a make sure after this you are blessed."

---

[3] To date, Eller has not been located or arrested.

TT8, Sessions 3068, 3070, 3072, 3074. Defendant Leonis later responded that he was "wit whatever boy." PSR ¶ 17; TT8, Sessions 3151, 3154, 3156, 3158, 3160. Eller and Garcia continued to talk about the robbery, with Eller noting that if the two brothers who lived at the robbery mark were "slapped up a bit," they would "give up" the drugs and money. TT8, Session 3103.

In the days following, Gonzalez and others went to Union City to locate the robbery mark and conduct surveillance. For example, on September 10, 2018, Gonzalez and Garcia spoke, and Garcia told Gonzalez that he was going to "check out" the stash house location in Union City. Gonzalez volunteered to join him. Investigators conducted physical surveillance and saw Garcia pick up Gonzalez and then drive to Union City to take a "dry run" at the proposed robbery location. PSR ¶ 18; TT8, Sessions 4259, 4284, 4295.

On September 17, 2018, Garcia and Gonzalez discussed additional surveillance that Gonzalez had done of the Union City location, and Gonzalez notified Garcia that he had seen a couple with a baby at the address. PSR ¶ 19; TT9, Session 4830. Gonzalez told Garcia that he planned to go back to the address and "post up" (conduct additional surveillance), and both Garcia and Gonzalez discussed "needing this," because things had been "slow" lately. TT9, Session 4835.

On September 19, 2018, Garcia told Gonzalez that Eller had confirmed that the marks were still selling drugs and that there likely was product at the house. They agreed that given that the children appeared to be school-aged, the best time for the robbery would be in the morning after the children were at school. PSR ¶ 20; TT9, Session 5337.

### 4. Suspected "Leak" & Obstruction Enhancement

On September 20, 2018, based on the intercepted calls summarized above, the FBI conducted a search warrant at the Union City residence. On October 2, Eller informed Garcia that federal agents had gone to the house. Garcia then called both Gonzalez and Defendant Juan Dominguez to tell them that the planned robbery was off. Specifically, Garcia told Gonzalez, "Never mind with all that, alright?" Gonzalez said, "Oh, ok. What happened?" and Garcia stated, "the fucking alphabet boys got 'em . . . they told them that somebody was going to pay them a visit." Gonzalez responded, "No shit . . . that's scary boy," and Garcia told him to "be smooth." TT10, Session 2756; TT10, Session 2764 (Garcia tells Dominguez: "The fucken alphabet boys got that address. You know the one.").

U.S. SENTENCING MEMO. RE JUAN GONZALEZ    4
21-CR-311 YGR

Garcia suspected that there was a "loose screw" (i.e., an informant) in their crew, and by October 14, intercepted communications revealed that Garcia believed that he had identified Victim-1 as the suspected informant. TT10, Sessions 2764, 2794; TT10, Session 377 (Garcia says: "I found the loose screw … it's in my own house"). Subsequent intercepted communications suggested that Garcia assaulted Victim-1 on October 14, and on October 15, Garcia told Dominguez that Garcia was told by "the homie" that Victim-1 needed to be "let go." PSR ¶ 22; TT6, Session 19315. That same day, Garcia told Leonis that Victim-1 was a "rat." TT10, Session 516. On October 16, 2018, Victim-1 did not show up for work and cut off contact with Garcia, Dominguez, Gonzalez, Leonis, and Valenzuela. PSR ¶ 22. Over the next two days, there were calls on the wires involving each of the defendants discussing Victim-1. PSR ¶ 22; *e.g.*, TT10, Session 810 (call between Garcia and Leonis, where Garcia says that he had someone call Victim-1's workplace to see if Victim-1 was there and was told that Victim-1 had not come to work, to which Garcia notes: "He's fucking scared for his life, fool."). On October 17, 2018, Valenzuela was intercepted calling Gonzalez to inform Gonzalez that Victim-1 (referred to in the call as the "run around boy") had gone missing and left his belonging behind. PSR ¶ 23; TT9, Session 10985.

On October 19, 2018, Garcia was intercepted talking to Taylor Johnston, a suspected associate of EHP and a suspected member of a gang known as the West Side Mob. During the intercepted call, Johnston asked Garcia whether Victim-1 had come back, and Garcia said that he had not. Johnston said that he could not believe that Victim-1 had not come back and asked Garcia what the neighborhood was saying, to which Garcia said, "it's on sight with him," "even if he comes back."" "On sight" means that EHP members are authorized and expected to use force against the individual who has been targeted by the gang.

### 5. Other Relevant Conduct[4]

The intercepted communications in this case show that Gonzalez was a high-level EHP member

---

[4] The below information is directly relevant to the charged conduct and to Gonzalez's history and characteristics and is therefore properly included in the PSR. *See* U.S.S.G. § 1B1.3(a)(1)(B); *United States v. Danielson*, 325 F.3d 1054, 1076 (9th Cir. 2003) ("A district court may consider uncharged conduct for sentencing purposes when the conduct is relevant within the meaning of § 1B1.3(a)(1) of the Sentencing Guidelines.").

U.S. SENTENCING MEMO. RE JUAN GONZALEZ      5
21-CR-311 YGR

who was active in drug dealing, gun trafficking, recruiting new gang members, and ordering and participating in assaults of rival gang members. Below, the government identifies a small sample of these activities as captured on the wires.

<u>Gang meetings.</u>  As a high-ranking EHP member, Gonzalez repeatedly made notifications to EHP members about "church" (i.e., EHP meetings). PSR ¶ 25; TT6, Sessions 4087, 12549; TT9 Sessions 907, 912, 1563, 1568, 1569, 1573, 1921, 1923, 2278, 2507, 2709, 2909, 2917, 2946, 3033, 3059, 3088, 3090, 3117, 3142, 3150 (calls about meetings at a location in Alum Rock, San Jose and at a residence in Morgan Hill). In fact, the intercepted communications reveal that one of the reasons for calling these meetings was so that older generation EHP members could express to the more junior members (the "lil homies") that they were expected to function—that is, Gonzalez was upset about their lack of participation in gang affairs and them not having guns. PSR ¶ 26. At the upcoming meeting, Gonzalez expressed that he planned to change the "program" and "step on their tails." *Id.* Gonzalez directed other senior EHP members to bring "older homies from the sixth," and select "recruits" so that Gonzalez could put more "responsibility" on them. PSR ¶ 27; TT9, Sessions 955, 2238, 2803, 3059, 3088, 3090. Based on these calls, FBI agents conducted physical surveillance of one of these meetings (in Morgan Hill) on September 8, 2018. PSR ¶ 28. Following that meeting, in an intercepted call on September 10, 2018 with Garcia, Gonzalez and Garcia discussed the meeting, expressing how well they thought it went. *Id.*; TT9, Session 3309 (Gonzalez and Garcia discussed that the meeting was "good shit" and that there was a "good turnout." Gonzalez appreciated that Garcia and others had "backed [his] word up" because the younger members thought that Gonzales was "too hard on them.").

<u>Recruiting.</u>  Consistent with his role in setting up EHP meetings aimed at bolstering the engagement of younger gang members, the intercepted communications show that Gonzalez was active in recruiting new EHP members. The calls show that Gonzalez encouraged other EHP members to conduct what he called "full investigations" into multiple individuals who were interested in joining EHP. PSR ¶ 29; TT9, Sessions 899, 901 (Gonzalez speaking to an unidentified male who tells him that a recruit was a "no go," "basura," and "never cleared." Gonzalez thanks him and say he will let the "homies" know); TT9 Sessions 913, 915, 923, 924, 929, 931, 960 (Gonzalez calls EHP members and emphasizes that they need to do "full investigations right before they get close," and that three people

U.S. SENTENCING MEMO. RE JUAN GONZALEZ     6
21-CR-311 YGR

who wanted to join EHP were not good and "investigations" are the "procedures you gotta take."). Gonzalez often discussed his findings with Dominguez. For example, on September 11, 2018, Gonzalez and Dominguez had a call about a potential EHP recruit who wanted to "come around to the hood" and claimed he had been a member of another Norteño street gang called San Jose Grande (SJG). Dominguez said that he talked to members of SJG and found out the recruit was a "bitch" and "ran from them." PSR ¶ 30. Gonzalez told Dominguez to "shut it down," stating that the recruit "does not have permission to put the hood in his mouth." PSR ¶ 30; TT9, Session 3618.

<u>Drug dealing.</u>   The intercepted wires also show multiple instances of Gonzalez engaging in drug trafficking of cocaine (aka "white girl") and methamphetamine. PSR ¶ 31. Gonzalez often would use code words, such as "white girl" (cocaine), "brick" (a kilogram or "brick" of narcotics), and "car," "rims," and "test drive" when speaking about drugs. *Id.* For example, on September 23, 2018, Gonzalez was intercepted speaking to "Gameboy" about buying cocaine. Gameboy told Gonzalez that his "boy," who was also a "homie," wanted "850" and confirmed it was "fire" (good quality). Gonzalez stated he wanted "four" and planned to "go there" over the weekend and would call Gameboy. PSR ¶ 32; TT9, Sessions 5865, 6039, 6040. The intercepted calls show that Gonzalez sold what he had to others, including an individual named "Payaso," to whom Gonzalez was intercepted engaging in arranging drug sales on August 28, 2018 (TT9, Sessions 651, 663, 664), September 9, 2018 (TT9, Session 3145) (during this call, Payaso notes that he is "shaking" and wants to buy a gram), and October 11, 2018 (TT9, Sessions 9723, 9726). PSR ¶ 33.

Gonzalez often engaged in drug sales with co-defendant Paul Valenzuela. For example, on August 29, 2018, Gonzalez and Valenzuela discussed drug prices—Valenzuela asked Gonzalez how much he charges, and Gonzalez replied "375." PSR ¶ 34. Gonzalez continued: "I'm saying like, like, 425 at least since it is usually what they go for." *Id.*; TT9, Session 992. In late September, Gonzalez complained to Valenzuela about the quality of some of the drugs he had received. On the calls, Valenzuela asks Gonzalez, "What did you want me to tell him? Did you want your money back?" Gonzalez replied: "Get me another car," a "better running car" because "the sparkplug misfired." Valenzuela said he would get a resolution with the source of supply. PSR ¶ 34; TT9, Sessions 4643, 5512, 6177, 6222, 6223. Intercepted calls also show that Gonzalez sold a "zip" (ounce) of "white girl"

to an individual known as "Panda" on September 28, 2018. PSR ¶ 35. Panda asked Gonzalez, "how much" for a "zip" of "white girl," and Gonzalez initially quoted Panda "950" but then agreed to sell it at "9." PSR ¶ 35, TT9, Sessions 6741, 7317.

<u>Firearms trafficking.</u>  Alongside the many instances of drug dealing caught on the wires are an equal number of intercepted communications demonstrating that Gonzalez was a prolific firearms trafficker with access to many guns. On August 17, 2018, Gonzalez, Garcia, and Dominguez discussed buying handguns. PSR ¶ 36. Gonzalez wanted a "40" and requested to have a "G" on the side of the "Glock." PSR ¶ 36; TT6, Sessions 10253, 10254, 10255, 10261. That same day, Gonzalez offered to purchase from Dominguez three guns for "six a piece," noting that "it's for us," "for the hood." PSR ¶ 36; TT6, Sessions 10263, 10268, 10301, 10302, 10303; TT9, Sessions 2211, 2214, 2238, 2285.

<u>Acts of Violence</u>.  Other intercepted communications show that Gonzalez was willing to commit violence. For example, in intercepted communications between October 3, 2018, and October 5, 2018, Gonzalez was notified that an EHP member had been assaulted by a Capitol Park Locos gang member. During these intercepted communications, Gonzalez communicated that he wanted to "smash" the rival gang member who was responsible for the assault, and he suggested multiple locations in San Jose to fight the rival gang member, noting that 2-4 members of EHP could fight 2-4 members of the rival gang when it was dark outside to avoid law enforcement. PSR ¶ 37. Other intercepted communications captured Gonzalez advocating for or engaging in violence, including communications showing that Gonzalez assaulted a member of the East Side Familia ("ESF") gang after members of ESF tagged a wall in EHP territory. *Id.*  These calls and texts took place beginning at the end of July 2018 and lasted through mid-August 2018. *Id.*

**III.   Gonzalez's Criminal History**

Gonzalez has two felony convictions related to narcotics and conspiracy to commit a crime with the California gang enhancement. He also has minor convictions for driving under the influence, fighting in public, and possession of a controlled substance stretching back to approximately 2002. The government agrees with Probation's calculations that Gonzalez's total criminal history score is four, which places him in a Level III Criminal History Category. PSR ¶¶ 63–64.

## IV.   SENTENCING RECOMMENDATION

Consideration of all of the sentencing factors set forth in Title 18, United States Code, Section 3553(a) demonstrates that a 24-month sentence for Gonzalez is sufficient, but not greater than necessary, to comply with the purposes set forth in Section 3553(a), paragraph (2).

Gonzalez's offense was dangerous and, but for the FBI's intervention, his actions would have posed great peril to those he planned to rob and to those in the surrounding community.  The motivation behind the robbery plot was captured in an intercepted call between Garcia and Gonzalez, where the two discussed that the crew "needed" to hit the mark to secure both a brick of cocaine and money that could be used to buy another brick because things had been "slow" lately— motivations suggestive of larger, ongoing criminal purposes, including drug-trafficking.  Gonzalez's actions demonstrate that he was eager to take part in the planned robbery: he volunteered to go with Garcia and other members of the EHP crew to do a "dry run," and subsequently went to Union City on his own to conduct additional surveillance.  Once the robbery plot was thwarted, Gonzalez—a high-ranking member of EHP, who was aware of the rule that gang members must not cooperate with law enforcement—was among those who were informed that Victim-1, the suspected "snitch," had fled town.  This call placed Gonzalez on notice that of Victim-1's suspected cooperation, resulting in the neighborhood saying that "it's on sight with him"—meaning that EHP members were expected to commit violence against Victim-1 if and when he was located.  The crime at issue is no doubt serious and deserving of a 24-month sentence.

As noted, the government does not dispute Probation's determination that Gonzalez has a Criminal History Category of III (*see* PSR ¶¶ 63–64), and the government agrees with Probation's Guidelines calculations of an offense level of 20, after acceptance of responsibility.[5]  That yields a

---

[5] The government submits that the obstruction enhancement is proper in this case. As a high-ranking member of EHP, Gonzalez knew and/or could reasonably foresee that Victim-1 would be subject to violent retaliation because of his suspected cooperation with law enforcement. As the government has set forth, the evidence in this case shows that Garcia was communicating with other members of EHP about Victim-1's suspected cooperation, and those other members were communicating and informing each other about Victim-1 having disappeared, including in the call between Valenzuela and Gonzalez. As a high-ranking and influential member of EHP, Gonzalez would have known and/or could have reasonably foreseen that he and other members of EHP were expected to retaliate against Victim-1 if/when they saw Victim-1 for Victim-1's suspected role in exposing the robbery plot to law enforcement. The Court may consider all the evidence in this case in its assessment of the enhancement, including the actions of Gonzalez's co-defendants. *See* U.S.S.G. § 1B1.3(a)(1) (defining "[r]elevant [c]onduct" for sentencing to include acts undertaken "in the course of attempting to avoid detection or responsibility for th[e] offense"); U.S.S.G. § 3B1.1 cmt. n.1 (defining "participant" as

U.S. SENTENCING MEMO. RE JUAN GONZALEZ      9
21-CR-311 YGR

guidelines calculation of 41 months to 51 months (*see* PSR ¶ 98).

The government's recommended sentenced is a downward variance that takes into account (1) Gonzalez's acceptance of responsibility as part of a global resolution with his co-defendants, which resolution has facilitated a speedy resolution of the matter (and prior to cooperators being identified); (2) the significant loss that Gonzalez experienced in 2021 while on pre-trial release regarding the death of his son (PSR ¶ 79); and (3) his efforts towards rehabilitation while on pretrial release notwithstanding that loss (PSR ¶¶ 4, 83).  The government's recommendation also takes into consideration the need "to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).  Two of Gonzalez's co-defendants—who were just as culpable than Gonzalez, especially considering Gonzalez's high-rank within EHP and the manifold criminal activities he was captured participating in over the wiretaps—have been sentenced to 24 months of custody.  Considering these factors, as well as each of the Section 3553(a) factors, including the need for just punishment, the government's proposed 24-month sentence is "sufficient but not greater that necessary" to satisfy the sentencing goals of Title 18, United States Code, Section 3553.

## V.     CONCLUSION

For the reasons set forth above, the government requests that the defendant be sentenced to 24 months of imprisonment followed by three years of supervised release.

DATED:  November 9, 2023                                    Respectfully submitted,

THOMAS A. COLTHURST
Chief, Criminal Division

_____/s/_____
MARI OVERBECK
Assistant United States Attorney

---

"a person who is criminally responsible for the commission of the offense, but need not have been convicted"); *United States v. Thomsen*, 830 F.3d 1049, 1071 (9th Cir. 2016) (explaining that a sentencing court may consider "charged, uncharged, and even acquitted conduct" when applying an enhancement).

U.S. SENTENCING MEMO. RE JUAN GONZALEZ     10
21-CR-311 YGR